UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

| | |
|---|---|
| UNITED STATES OF AMERICA | |
| v. | Criminal No. 21-CR-10312-DJC |
| VINCENT CARUSO, a/k/a "FATZ" | |
| Defendant | |

**MEMORANDUM IN SUPPORT OF SENTENCING RECOMMENDATION**

For more than three years, the Defendant was the leader of a drug trafficking operation ("DTO") that flooded the area North of Boston with hundreds of thousands of pressed fentanyl pills. To arm his DTO, the Defendant accumulated an arsenal that included numerous handguns, an AR-15 rifle, and a fully automatic handgun.  The Defendant also orchestrated multiple armed robberies, as well as a shooting where the fully automatic handgun was used to spray dozens of rounds at a porch full of people. These violent incidents unfolded while the Defendant was on pretrial release for multiple pending state drug and gun cases. All the while, the Defendant bragged on social media in videos showcasing his collection of weapons, jewelry, and the vast quantities of pills he was selling.

The government recommends a sentence of 270 months (approximately 22 and one-half years), which is at the low-end of the guideline sentence range ("GSR") agreed-to by the Parties and at the high-end of the agreed-to sentencing range.  Probation has calculated the GSR to be much higher, but there is no need to exceed the sentencing range in the Plea Agreement.  A sentence of 270 months properly reflects the seriousness of the offense, the need for deterrence and punishment, and is sufficient, but no greater than necessary, to accomplish the goals of sentencing.

**PROCEDURAL POSTURE AND THE ADVISORY SENTENCING GUIDELINES[1]**

---

[1] References are as follows: docket entries in this case by entry number (ECF #_); related case docket entries by docket number and entry number (Docket No. __, ECF # _); presentence investigation report (PSR) are by paragraph (PSR ¶_) or page (PSR, p. _); and exhibits to this sentencing memorandum by number and filename if a

On March 15, 2022, the Defendant pleaded guilty to the five count Indictment charging him with: conspiracy to manufacture and distribute 400 grams or more of fentanyl, in violation of 21 U.S.C. § 846; conspiracy to use and carry firearms during and in relation to a drug trafficking crime, in violation of 18 U.S.C. § 924(o); so much of Count Three that alleged use and carrying of a firearm during and in relation to a drug trafficking crime, in violation of 18 U.S.C. § 924(c)(1)(A); conspiracy to interfere with commerce by robbery, in violation of 18 U.S.C. § 1951(a); and money laundering conspiracy, in violation of 18 U.S.C. § 1956(h).

The Parties entered into a Plea Agreement pursuant to Fed. R. Crim. P. 11(c)(1)(C), with a sentencing range of 180 to 270 months (ECF #72).  Upon imposition of a sentence within the agreed-to sentencing range, the government agreed to dismiss the machinegun allegation set forth in Count Three.  See ECF #72.

## I.    OFFENSE LEVEL CALCULATION

In the Plea Agreement, the parties calculated the total offense level to be 36.  Probation's calculation of the offense level does not accord with that set forth in the Plea Agreement (PSR ¶¶191-202).

**The following is the Parties calculation of Offense Level for Group One:**[2]

| | |
|---|---|
| *Base Offense Level*: | 36, because the Defendant is responsible for at least 12 kilograms but less than 36 kilograms of fentanyl, under USSG § 2D1.1(c)(2) |
| *Leadership Adjustment*: | +3, because the Defendant was a manager or supervisor and the criminal activity involved five or more participants or was otherwise extensive, under USSG § 3B1.1(b) |
| *Acceptance of Responsibility:* | -3, because the Defendant has clearly demonstrated acceptance of responsibility, under USSG § 3E1.1 |

digital video file on compact disc (Exhibit _).  The U.S. Probation Department is referred to as "Probation."

[2] The Parties and Probation agree that Group Two, which relates to Count Four, is nine or more offense levels less than Group One, and therefore does not increase the total offense level (ECF #72, PSR ¶268).  See USSG § 3D1.4(c) ("Disregard any Group that is 9 or more levels less serious than the Group with the highest offense level.").

_Total Offense Level:_                  36

        Criminal History Category:             2 points (PSR ¶ 280), Category II (PSR ¶ 281)
        Guidelines Sentence Range:           210-262 months
        Mandatory Statutory Imprisonment:     60 months imposed consecutively (USSG § 2K2.4(b))[3]
        <u>Total Guidelines Sentence Range:</u>      <u>270-322 months</u>

**<u>The following is Probation's Calculation of the Offense Level for Group One</u>**:

_Base Offense Level_:                36, because the Defendant is responsible for at least 12 kilograms but less than 36 kilograms of fentanyl, under USSG § 2D1.1(c)(2)

_Offense Characteristics:_        +2, because Defendant maintained premises for purposes of manufacturing or distributing a controlled substance, under USSG §2Dl.l(b)(12)

_Leadership Adjustment_         +4, because the Defendant was an organizer or leader of a criminal activity that involved five or more participants or was otherwise extensive, under USSG § 3B1.1(a)

_Acceptance of Responsibility:_    -3, because the Defendant has clearly demonstrated acceptance of responsibility, under USSG § 3E1.1

_Total Offense Level:_                  39

        Criminal History Category:             2 points (PSR ¶ 280), Category II (PSR ¶ 281)
        Guidelines Sentence Range:           292-365 months
        Mandatory Statutory Imprisonment:     60 months imposed consecutively

        <u>Total Guidelines Sentence Range:</u>      <u>352-425 months (approximately 30 to 35 years)</u>

The Parties lodged objections to the PSR with respect to disparities in Offense Level calculation.

## <u>ARGUMENT</u>

**I.**    **THE SENTENCING FACTORS UNDER 18 U.S.C. § 3553 REQUIRE A SENTENCE OF 270 MONTHS**

The Court must consider the factors set forth in 18 U.S.C. § 3553(a) in determining a sentence

---

[3]<u>See</u> 18 U.S.C. § 924(c)(1)(A), (D).

that is sufficient, but not greater than necessary, to comply with the purposes of sentencing set forth in § 3553(a)(2).  Among those factors are the "nature and circumstances of the offense" and the history and characteristics of the Defendant.  See 18 U.S.C. § 3553(a)(1).  The sentence must also "reflect the seriousness of the offense," "promote respect for the law," and "provide just punishment for the offense." See 18 U.S.C. § 3553(a)(2)(A).  There must also be a consideration of whether the sentence affords "adequate deterrence" for both the defendant and others.  See 18 U.S.C. § 3553(a)(2)(B) (the court may impose a sentence "to afford adequate deterrence to criminal conduct").  Lastly, the sentence must protect the public from the further crimes of the Defendant.  See 18 U.S.C. § 3553(a)(2)(C) ("protect the public from further crimes of the defendant").  In this case, consideration of the § 3553(a) factors reveals that a sentence of 270 months is sufficient, but not greater than necessary, to meet the goals of sentencing.

### A.      Nature and Circumstances of the Offense

The nature and seriousness of this case cannot be overstated and speak precisely to the type of case that merits a sentence of no less than 270 months.  The Defendant ran a sprawling and extensive enterprise that operated for years in Essex County.  The DTO specialized in the distribution of "blues" or "perc 30s".  These are pills comprised of fentanyl, dyed to appear similar to actual Percocet pills, pressed into pill form by a machine, and stamped with markings to make them appear similar to Percocet 30 mg tablets.  The Defendant agrees with the government that he is responsible for a drug weight of up to 36 kilograms of fentanyl, which equates to at least 360,000 pressed fentanyl pills.  See ECF #72.

During the period of 2018 through 2022 while the DTO was in operating in Danvers, Salem, Saugus, and Lynn, over 1000 people in Essex County have died from opiate abuse, to say nothing of the thousands of others who died in neighboring communities.[4]  The Defendant distributed hundreds

---

[4] See https://www.mass.gov/doc/opioid-related-overdose-deaths-by-county-june-2022/download (Essex County);

of thousands of these pressed fentanyl pills, generating large profits for himself while spreading untold despair, misery, and death to those afflicted by substance abuse disorder. But that is not at all. The Defendant also orchestrated a campaign of brazen violence directly tied to his drug distribution efforts and documented his profits on social media.

### 1. Drug Weight

The parties have agreed to a drug weight of 12 kilograms to 36 kilograms of fentanyl. As a rule of thumb, 10,000 pills equate to a kilogram, assuming each pill weighs .10 grams (consistent with the seizures in this case). Based upon the number of pills distributed by the Defendant's DTO, there is no question that the drug weight is far closer to 36 kilograms of fentanyl (e.g., 360,000 pills) as opposed to 12 kilograms. Not only is this drug weight fully substantiated,[5] this is, by all accounts, an extremely conservative estimate of the amount of fentanyl the Defendant introduced into Massachusetts communities.

For example, a video of resupply taking place on May 19, 2021 (that the Defendant filmed), depicts over 50,000 pills being weighed and packaged into smaller 1000-pill packages.[6] Multiple cooperating witnesses described these resupplies taking place about once a month for about a year (from June 2020 through June 2021), equating to roughly 500,000 pills. See PSR ¶¶24. Another video depicts the Defendant handling roughly 500 grams of raw fentanyl.[7] See PSR ¶¶99-100. The Defendant's ledger from September 2020, demonstrated that this drug weight was no exaggeration: he had over 63,000 "Blues" on hand (referring to blue fentanyl pills designed to imitate Percocet 30mg)

---

attached as Exhibit 2.

[5] The drug weight is agreed-to, but would otherwise be fully substantiated through recovered ledgers (PSR ¶189), drug and evidence seizures (PSR ¶¶254), recordings (PSR ¶¶103-109), controlled purchases (PSR ¶¶83-98), videos made by Vincent CARUSO of raw fentanyl (PSR ¶99) and a resupply of pressed fentanyl pills (PSR ¶100-102), digital evidence (PSR ¶¶59-61; Exhibit 1), and cooperating witness information (PSR ¶¶68, 215-245).

[6] See PSR ¶¶101-102; Exhibit 1 (""Fatzsl52 - Snapchat Video - Large Bags of Pills, Video 1 - 2021-05-19.mp4"; "Fatzsl52 - Snapchat Video - Large Bags of Pills, Video 2 - 2021-05-19.mp4")

[7] See Exhibit 1 ("Fatzsl52 - Snapchat Video - Holding Raw Fentanyl - 2021-05-10.mp4"; "Fatzsl52 - Snapchat Video - Holding Raw Fentanyl, 2nd Video - 2021-05-10.mp4").

marked at $5 per pill, and 54,000 "Greens" on hand (referring to green fentanyl pills designed to imitate Percocet 15mg) marked at $3 per pill, totaling over 117,000 pills worth over $477,000 at his wholesale prices.  See PSR ¶189; Exhibit 16, p. 33; ECF #2-1 (describing pill prices).

For a period, the Defendant pressed his own fentanyl pills.  Vincent CARUSO boasted in a recording, "Perc 30s, I make them ni**a." PSR ¶59; Exhibit 1 ("Caruso - Perk 30s I Make them Ni___a.mp4").  That certainly was true: during the period when the DTO was based in Saugus and Defendant made his own pills, he was producing 20,000 pills per week for over five months, equating to roughly 400,000 pills.  See PSR ¶¶25, 215-226.[8] Another video from this period depicts the Defendant's pill press in operation in the basement of his Founders Way apartment in Saugus, with thousands of completed pills also visible.  See PSR ¶60; Exhibit 1 ("Pill Press Operating.mp4").  Though the Defendant was tipped off about the upcoming search warrant and moved his pill press, aspects of this manufacturing and distribution operation were still recovered by Massachusetts State Police in January 2020.  See PSR ¶¶50-56, 215-226.

Overall, the PSR and videos contained in Exhibit 1 provides the Court with a glimpse into the staggering amount of fentanyl that this Defendant sold.  Given this weight, and the hundreds of thousands of pills distributed by his DTO, the government makes no exaggeration in its claim that this Defendant supplied a sizeable percentage of the fentanyl pills in the areas around Boston.

### 2.  The DTO and Defendant's Role

At these weights, and with his own in-house manufacturing operation, it is obvious that the Defendant was the source of supply for dozens of fentanyl dealers throughout Massachusetts and Essex County.  The Defendant's own ledgers show this to be true.  See PSR ¶¶26, 185,189.

The DTO was in operation for multiple years and persisted despite at least three separate

---

[8] The Defendant had a subordinate, C.M., who was responsible for running the press and would "press pills all day." PSR ¶¶13, 41, 50, 218-221.

investigations by state and local law enforcement, and arrests of its members.  In May 2018, the Danvers Police executed a search warrant at Laurie CARUSO's residence and recovered hundreds of pills, multiple pounds of marijuana, over $30,000 in cash, and a firearm (PSR ¶¶30-46; Exhibit 3).  In January 2020, the Massachusetts State Police executed search warrants in Saugus at the two apartments controlled by the Defendant's DTO (PSR ¶¶47-58).  Hundreds of fentanyl pills, raw fentanyl, a firearm, and stamps used in the creation of fentanyl pills were among the items recovered (PSR ¶¶47-58; Exhibits 5 & 6).  In June 2020, the Salem Police executed a search warrant and recovered over $60,000 (PSR ¶¶70-71, 161, Exhibit 4).  Despite all this, and two pending state cases that resulted, the Defendant continued to deal outrageous quantities of drugs with impunity, and brag about his profits on social media.  See, e.g., Exhibits 1 & 15.

The Defendant was able to do so because of the extent of his organization, which removed him from the day-to-day activity of drug dealing.  Put simply, the Defendant rarely touched the drugs himself.  The Defendant arranged the drug transactions and then issued directives to his runners, which included his mother and Nicole BENTON, to fulfill them and collect payment.  The Defendant also coordinated resupply and transportation of the raw fentanyl and completed pills through couriers who would conduct these trips and bring the pills to Lynn.  See PSR ¶¶14, 16, 231, 240-245.  As a result, the organization not only facilitated the sale of larger quantities through additional runners, it also existed to remove the Defendant from the outwardly facing aspects of the business.  Sitting far removed from the street, there was little chance of the Defendant being caught directly in possession of controlled substances, and he never did so in public.

That is not to say that he flew under the radar.  The Defendant was extremely visible on social media.  For example, the Defendant posted a copy of his booking sheet from the January 2020 arrest by MSP, essentially bragging about the fact that the serious drug and firearms charges did not bother him: the caption read, "Y'all nig**s be ready to cry in ya mug shots lol I laugh at these bitch ass nig**s."  See Exhibit 16, p. 34.  He then continued to boast publicly on social media about the amount

of money he was accumulating.  See Exhibit 15 (posts to Instagram), and 1.[9]

### 3.  Violence and Weapons

The Defendant is responsible for three serious acts of violence.  While the drug weight drives the sentence, this Court should carefully consider the firearms and violence in context of the statutory sentencing factors.

### a.  Firearms

In addition to large quantities of fentanyl, the Defendant also accumulated a staggering number of guns. Multiple firearms were recovered in Danvers, and Saugus during state search warrants in 2018 and 2020 (PSR ¶¶30-61; Exhibits 3 & 5). An AR-15 rifle was recovered during the May 2021 robbery discussed below (PSR ¶¶72-82).  More than six firearms were recovered from 12 Fremont Place on June 30, 2021, including a Glock 17, 9mm firearm that is in fact a machinegun (PSR ¶¶127-130; Exhibit 10). A firearm was recovered from the Defendant's residence at 1 Reliance Row, and in Nicole BENTON's residence (PSR ¶¶131-133, 134-138; Exhibits 9 & 11). And another firearm was recovered from the Red Roof Inn in Saugus, where the Defendant and Ernest JOHNSON were arrested (PSR ¶¶142-144).[10]

This is but a small sampling of the arsenal the Defendant possessed over the years. Even though more than a dozen firearms were recovered, many more were captured on recordings made by the Defendant. One such recording depicts a second firearm with a selector switch (i.e., machinegun) that was not recovered. See PSR ¶61; Exhibit 1 ("Fatzsl52 - Snapchat Video - Firearm with Switch - 2020-09").  Numerous examples of these recordings are set forth in Exhibit 1, and still images from some of these recordings are contained in Exhibit 16.[11]

---

[9] The Defendant appears to continue boasting on Instagram, with posts as recent as June 15, 2022, presumably being coordinated with individuals outside of detention. Recent posts appear to reference the significance of his 180 to 270 month sentencing range and that "he knew what he signed up for." Exhibit 15, p. 24.

[10] This is to say nothing of the 50-round drum magazine recovered from 285 Lynn Shore Drive.  See PSR ¶124.

[11] There are many such videos recovered in the case, the government has placed a number of them on Exhibit 1, and

### b.  March 2020 Home Invasion

The Defendant pled guilty to Count Four, which charged him with conspiring to rob an individual of drugs, money, and jewelry.  On its own, this is a serious offense and would merit a substantial sentence: the victim was betrayed by his roommate, assaulted at gunpoint, struck by the Defendant's coconspirators, and robbed of $18,000 and jewelry.  See PSR ¶¶62-69.

As with the DTO's day to day drug operation, the Defendant also did not personally participate in the offense, but orchestrated the crime for others to commit.  Here, however, he was captured on video going into Dunkin Donuts waiting for the robbery to be completed. While the Defendant grabbed coffee, the robbers made entry into the apartment with zip-ties and what appeared to be a handgun.  A struggle ensued and, ultimately, the robbers placed the victims on their knees and stole $18,000 in cash and jewelry.  The robbers made their way back to the Defendant's vehicle and they drove off and split the loot.

This crime is only exacerbated by the fact that the Defendant was on pretrial release at the time, having posted a substantial cash bail to secure his release from the drug and firearm charges resulting from the search warrants on January 8, 2020.  In fact, not only was he on pretrial release, but the Defendant had court that very day: he appeared in Lynn District Court for a scheduled probable cause hearing on the January 2020 drug case (Exhibit 14), left Court and proceeded to pick up the coconspirators and commit the robbery.  See PSR ¶¶ 62-69.

### c.  May 4, 2021, Attempted Robbery

The Defendant is also responsible for an attempted robbery taking place in Saugus.  For this

---

cites to some of the highlights.  See e.g., Exhibit 1 ("IMG_0115.mp4"; "June 2021 Snapchat Videos Folder"; "Fatzsl52 - Snapchat Video -Multiple Guns on Lap - 2021-05-24.mp4"; "fatzsl52 - Snapchat video, Glock and Green Gun - Sent 2021-05-24-16-35-47UTC.mp4"; "fatzsl52 - Snapchat video, Glock with Switch - 2020-09-12-03-28-28UTC.mp4"; "Caruso - Cash, Scale, Brick, and Firearm - June 2019.mp4"; "Caruso - Numerous Guns on Couch in Saugus Basement - December 2019.mov"; "Caruso - Tec-22, Watch, in Automobile - June 2019.mp4"; "Caruso - Watch and Firearm - June 2019.mp4"; "IMG_0744.jpg"; "IMG_0350.png"; "Caruso - Watch and Firearm - June 2019.mp4").

incident, members of the Defendant's DTO targeted an individual as he walked to his vehicle. As before, the Defendant sent others to commit this crime on his behalf. The facts of this robbery are essentially undisputed, and involve two assailants attempting to rob an individual.[12]

Surveillance video shows the victim leaving an apartment building and walking to his car. As he does so, a vehicle drives down the hill towards the victim, while the first assailant runs up holding with what was later determined to be a white AR-15 rifle drawn and pointed at the victim. A second assailant joins, and a struggle ensues with the victim on the other side of the victim's vehicle. During the struggle, the victim escapes and runs off.

The second assailant returns to the his vehicle and leaves the area. The first assailant gets into the victim's vehicle, at which point the video concludes. Shortly thereafter, the first assailants is in the area as police respond. Police observe the first assailant and chase him. The first assailant runs from police, passes a dumpster and throws the AR-15 rifle into it (the weapon was later recovered). The first assailant then ran across Route 1 Southbound, vaults the median fence, and crosses over Route 1 Northbound. As noted in the PSR, the government has developed extensive evidence linking the Defendant to the first assailant and this incident.[13]

### d.  June 29, 2021, Machinegun Shooting

The most disturbing act of violence, however, is the June 28, 2021, shooting where the Defendant's fully automatic handgun was used to spray rounds in a residential neighborhood, striking multiple victims. The video in this case tells the tale visually and aurally. The motive behind this

---

[12] The identities of both assailants are known to the government.

[13] The first assailant was dropped off at a Boston hospital for a gunshot wound the following morning. The first assailant was captured on surveillance exiting a vehicle known to have been rented by BENTON and in use by the DTO at the time and was wearing an oversized melon-colored sweatshirt consistent with one owned by the Defendant. Investigators recovered images of JOHNSON holding what appears to be the same rifle on social media. Furthermore, a recording sent by Ernest JOHNSON shortly after the failed robbery inferably identifies the Defendant as the orchestrator: "If this is such my fault, who's the one that sent all of us to do this.  C'mon man. That's some lame ni**a shit." PSR ¶¶81-82. The Defendant and the first assailant had a text message conversation while the first assailant was in the hospital where they discussed the incident and whether the firearm was recovered from the dumpster.

shooting is believed to be retaliation for a close associate of the DTO being shot in Peabody a few days beforehand.  See PSR ¶¶112, 211, 212.[14]

Shortly after the associate was shot, in the early morning of June 25, 2021, the Defendant and JOHNSON began driving around with firearms, including specifically a fully automatic Glock 17, 9mm firearm with a selector switch and 30-round magazine.[15]  The timestamps of these videos are June 25, 2021, at 4:47 a.m., which was right after the associate was shot, and June 26, 2021, at 4:09 p.m., a day later.  See PSR ¶¶113-114.

Then, on June 28 into June 29, 2021, the fully automatic Glock handgun was now in the hands an individual who put it to use.[16]  At 12:03 in the morning on June 29, 2021, over 30 rounds were fired at a group of individuals gathered around a porch on Arlington Street in Lynn, Massachusetts.  The gunfire was captured on video and audio; the sound is unmistakably a fully automatic and the shooter strafes as he unloads his magazine.[17]  The group of victims scattered.  Lynn Police responded and recovered 31 shell casings in 9mm and .45 caliber, consistent with two shooters.  Multiple victims had been struck, and nearby homes and vehicles were riddled by the projectiles.  See PSR ¶ 110.

The evidence supports a finding that the Defendant is responsible for this shooting under the guidelines. Ten minutes before the shooting, the Defendant activated a police scanner application on his cellular phone (PSR ¶117). A few minutes after the shooting, the Defendant reviewed a social

---

[14] The entire DTO discussed this incident, and the significance of the associate being shot. Indeed, JOHNSON referenced it in a publicly posted videos on Facebook a few hours after the shooting. In the live video, JOHNSON claimed that there "there would have been hell to pay" if his "little man," referring to the victim of the shooting died from the shooting. JOHNSON then states that "there still gonna be hell pay" even though the associate survived. JOHNSON explains, with respect to those responsible for the shooting, that he is going to going to "put their houses on curfew every trip" "like [he] been doing" and that "it is going to really be crunch time on them niggas."

[15] The government is aware of this because the Defendant filmed videos of them doing so, and sent them over social media.  See PSR ¶¶113-114; Exhibit 1 ("fatzsl52 - Snapchat video, Glock 17, 9mm, Selector Switch, Video 1 - 2021-06-25, 4.27 am.mp4"; "IMG_2064.mp4").

[16] This individual is believed by the government to be the first assailant from the May 4, 2021, attempted robbery.

[17] Surveillance video from the shooting is contained on Exhibit 1. See Exhibit 1 ("2021.06.29 - Arlington Street Shooting Video.mp4"; "2021.06.29 - Arlington Street Shooting Video - 2nd.mp4").

media post concerning the shooting and sent Laurie CARUSO a news article regarding it (PSR ¶¶118-119).  The Defendant also had voice calls with the shooter about 45 minutes before and 40 minutes after the shooting (PSR ¶120).

Later that night, the Defendant engaged in a text message conversation with the shooter on June 29, 2021, at 9:21 p.m.  See PSR ¶120. The shooter tells the Defendant he will grab the "shit in da trunk tomorrow", "all my shit there", "My shit in" "There", which is a reference to where the Glock 17, 9mm machinegun was recovered (PSR ¶¶120-121; Exhibit 10).  The shooter then asks the Defendant, "You can get rid of the hoodie an sweats?", and the Defendant replies, "Ya I'll do that when I get home" (PSR ¶¶120). The shooter tells the Defendant, "don't throw the ski mask out I'm a wash it" (PSR ¶¶120).  On June 30, 2021, at 12:57 a.m., the Defendant replied, "Done" (PSR ¶¶120). The digital evidence proves that the Defendant returned to Lynn around this time and destroyed the clothing, as the shooter asked.

Around 1:00 a.m., Ernest JOHNSON used his cell phone to record a video of clothes burning in the back of 12 Fremont Place (PSR ¶122).  During the video, the Defendant's voice can be heard stating "Don't send him a video of this." PSR ¶ 122; Exhibit 1 ("Ernest JOHNSON Phone Videos\IMG_0746.MOV").  JOHNSON replies, "I'm not sending him shit, I'm having it for my proof." PSR ¶ 122.  JOHNSON then indicates he will save the video to the computer at the house and delete it off the phone.  PSR ¶ 122.  JOHNSON then states, "we got you cro", "good job." PSR ¶ 122.  The GPS device location for JOHNSON's cellular phone at 1:07 a.m. on June 30, 2021, shows it to be near 12 Fremont Place, Lynn, MA, and specifically in the vicinity of the backyard.  PSR¶ 122.

Five hours later, FBI executed a search warrant at 12 Fremont Place and located a cache of weapons in the trunk of a vehicle in the garage.  Among these weapons was the Glock 17, 9mm firearm with selector switch (PSR ¶¶121, 127-130).  A mask was also found in the trunk as well (PSR ¶121). The Glock 17, 9mm firearm with selector switch was matched by toolmarking comparison to the

casings recovered from the shooting on Arlington Street (Exhibit 13).[18]

The Defendant owns this shooting in every sense and must pay a serious price for his involvement. He is involved before – communicating with and transferring the gun to the shooter who used it, during – listening to the police response on the scanner application, and afterwards – communicating with the shooter, providing a place to stash the gun and clothing, and assisting the shooter in the destruction of evidence. This is a final and terrifying incident of senseless violence for which the Defendant must be held accountable.[19]

### 4. Profits

Pressed fentanyl pills are an extremely lucrative corner of the illicit drug market. See e.g., PSR ¶¶162-165. At a minimum, each kilogram of fentanyl, even if minimally adulterated, can yield tens of thousands of fentanyl pills, if not 100,000 pills. See PSR ¶182. The pressed pill market offers sizeable profits for every layer of distribution chain due to the exponential volume of pills that can be generated from even modest quantities of raw fentanyl.

In total, the Defendants in this case have agreed to forfeit over $200,000 in cash seized over the years. See ECF #72; 22-CR-10022-NMG, ECF #50 (Laurie Caruso Plea Agreement). In 2018, over $30,000 in cash was recovered from the Defendant's Danvers apartment that the DTO was utilizing. See PSR ¶¶39-40; Exhibit 3. In June 2020, Salem Police recovered over $65,000 in cash from Laurie CARUSO's apartment stuffed in a Gucci bag. See PSR ¶67; Exhibit 4.[20]

---

[18] The government notes that its prior Plea Agreement (ECF #48) that the Defendant repudiated on December 15, 2021 (ECF #60), was entered-into prior to the completion of ballistics analysis definitely tying the recovered machinegun to the casings from the June 29, 2021, incident. The ballistics comparison was completed in February 2022. With the completed report tying the recovered firearm to the shooting, the Defendant can now be substantively held accountable for this shooting.

[19] There is little to distinguish this incident from the recorded boasts by the Defendant that he "shot that [unspecified] ni**a's crib up three or four times, with his bitch ass." PSR ¶ 191; Exhibit 1 ("Fatzsl52 - Snapchat Audio - Audio Message re Shooting Crib - 2021-03-16.mp4"; "Fatzsl52 - Snapchat Audio - Audio Message re Shooting Crib, 2nd - 2021-03-16.mp4").

[20] While no drugs were recovered during this warrant, the Defendant was arrested on the outstanding home invasion warrant. See PSR ¶ 71.

The takedown for the Federal investigation in June 2021 revealed that business was still booming: over $68,000 in cash was recovered from the hotel room of the Defendant's grandparents; $10,888 in cash, an expensive Audemars Piguet watch, and tens of thousands of dollars in luxury brand shoes and accessories were in Laurie CARUSO's hotel room (along with over 500 pressed fentanyl pills stored in a shoe box);[21] and in the Defendant's residence, two diamond encrusted chains were recovered (one bearing Vincent CARUSO's street-name, "Fatz," and the other bearing an effigy[22] of former DTO member C.M.). See PSR ¶¶134-141; Exhibit 11. That is not all. The Defendant had also accumulated watches[23] and numerous firearms that were stored in his grandparents' garage. See PSR ¶¶128-130. Notably, this is only what was recovered.

Part of the purpose of accumulating so much cash, apparently, was to let others know just how much he had and was willing to frivolously spend. Numerous videos contained on Exhibit 1 demonstrate that the Defendant reveled in the money he was accumulating from dealing in fentanyl. On social media, in video after video, the Defendant showcased stacks of cash, jewelry, chains, firearms, and watches. See Exhibit 1. The Defendant's uniquely tattooed hands reveal that all of these first-person videos are in fact the Defendant holding diamond-encrusted watches, cash, and firearms. Two videos found on Laurie CARUSO's phone from December 9, 2020, depict a large amount of cash being counted by Vincent CARUSO and Ernest JOHNSON in a money counter. In the videos, a large amount of cash be seen strewn about; the Defendant is running thousands of dollars through the money

---

[21] These include women's shoes by Christian Louboutin, Balenciaga, Gucci, Chanel, Christian Dior, and Louis Vuitton. See Exhibit 7. For example, the average price of a pair of Christian Louboutin shoes is well over $700. See e.g., Neiman Marcus, Christian Louboutin (available at http://shorturl.at/glswP). The Balenciaga brand sneakers retail for over $900. See Balenciaga Website, Sneakers (available at http://shorturl.at/bwL78). Multiple Louis Vuitton handbags were also recovered Exhibit 7), and no handbag retails for less than $1,500. See Louis Vuitton Website, Handbags (available at http://shorturl.at/uyTY4).

[22] Nicole BENTON also had a similar chain made in her likeness. See Exhibit 9. A Rolex watch was also recovered from BENTON's residence (Exhibit 9), that Vincent CARUSO had given her. See Exhibit 1 ("filtered-2F5F8F6A-E66E-47D3-94F3-08AFD1EBDE1C.MP4").

[23] A skeletonized Audemars Piguet watch recovered from the Defendant at arrest was determined to be fake. Other watches recovered in this case, were determined to be authentic.

while being filmed by JOHNSON, who indicates that he will edit the video prior to posting it to social media. See Exhibit 1 ("Laurie CARUSO Phone Videos\IMG_0068.MOV, IMG_0069.MOV").

The typical accoutrements of the drug trade, such as automobiles, chains, stacks of cash, and watches, were not enough for the Defendant. His acquisitions veered into the unexpected, with ATVs and dirt bikes.[24] There was so much money, the Defendant apparently ran out of things to buy and brag about. He resorted to throwing cash in the air in nightclubs.[25] He also gambled extensively.[26] Records from The Brook casino in New Hampshire showed that the DTO wagered over $400,000 in cash over a roughly three-month period, losing about over $20,000 in total. See PSR ¶¶145-146. These $2,000 to $5,000 dollars parlay-style bets were being placed nearly every other day in Nicole BENTON's name by Laurie CARUSO, BENTON, JOHNSON. See PSR ¶¶117-154.[27]

### 5. Conclusion

From all this, the Court can discern the necessity of a 22-year sentence. Though this is the Defendant's first felony conviction, the facts of the offense reveal that it comes as a result of a nearly unparalleled campaign of drug dealing, violence, injuries and death that were the product of his violent, street-oriented DTO. The violent incidents distinguish this case from those where a firearm is merely possessed in connection with large drug quantities. Consequently, the low-end and middle of the Plea

---

[24] In fact, the Defendant posted a video on social media offering $1,000 to anyone who had a more tricked-out ATV than him, boasting about the custom Gucci seats he had installed, the custom rose-gold powder coat paint job, and styling that commemorated his now-deceased subordinate, C.M., who himself died of a drug overdose shortly after being bailed on charges related to the DTO. See Exhibit 1 ("IMG_1333.mov", "IMG_1334.mov", "IMG_1335.mov"); Exhibit 11.

[25] In one video posted on social media, the Defendant can be seen with a box full of money that he intends to throw into the air at a nightclub. The Defendant, wearing a Gucci jacket and bag and the two diamond encrusted chains, is depicted holding a literal cardboard box full of banded cash, while the caption reads, "I'm the king of this shit" "We putting 20 in the air tomorrow". See Exhibit 1 ("fatzsl52 - Snapchat video, Putting 20 In the Air - 2021-05-21-12-04-17UTC.mp4").

[26] See PSR ¶ 308 ("The defendant described his gambling as a 'bad problem'." "Prior to his arrest for the instant offense, the defendant was gambling up to $10,000 per day.").

[27] These were the Defendant's wagers though, because he took to social media to boast about how much he was betting. See Exhibit 1 ("Fatzsl52 - Snapchat Video - Betting Slip - 2021-02-27.mp4"; "Fatzsl52 - Snapchat Video - Betting Slip - 2020-09.mp4").

Agreement's sentencing range in no way accounts for the violent facts at issue here. By comparison, a 270-month sentence is consistent with the statutory penalty applicable to circumstances of firearms being discharged in furtherance of drug offenses (e.g., 18 U.S.C. 924(c)(1)(A)(iii)), and adequately reflects the nature and seriousness of the drug trafficking and multiple incidents of violence. The government urges the Court to go no lower. See 18 U.S.C. § 3553(a).

**B.      History and Characteristics of the Defendant**

The government acknowledges that this is the Defendant's first felony conviction, and first sentence of any length. In most circumstances, this might be a basis to consider a sentence below the GSR. Upon scrutiny, this is not such a case, and this is not such a Defendant.

**1.      The Plea Agreement and Government's Recommendation Account for the Defendant's Lack of Criminal Record**

To start, the Defendant's lack of criminal record was already taken into full consideration by the government when it entered into this Plea Agreement. This consideration is reflected in the charging structure, the cap of 270-months on the sentencing range, and the government's recommendation of a sentence at the low-end of the agreed-to GSR.

To be sure, in the face of overwhelming evidence, the Defendant ultimately accepted responsibility, did so promptly, without litigation, and prior to formal disclosure of any cooperating witnesses. These aspects of acceptance of responsibility are reflected in the 3-level reduction. These considerations also factored into the government's exercise of substantial charging discretion that benefitted the Defendant: the charging of a Section 924(c) count reduced the otherwise applicable GSR by 52 months.[28] Furthermore, the 270-months recommendation and sentencing cap are at the low-end

---

[28] The government notes that charging a substantive Section 924(c) count, while increasing the collective mandatory minimum by 60 months (to 180 months total), precluded the increase of the offense level by 4 (i.e., +2 for possession of a dangerous weapon under USSG § 2D1.1(b)(1), and +2 for use of violence, USSG § 2D1.1(b)(2). See USSG § 2K2.4, cmt. 4 ("If a sentence under this guideline is imposed in conjunction with a sentence for an underlying offense, do not apply any specific offense characteristic for possession, brandishing, use, or discharge of an explosive or firearm when determining the sentence for the underlying offense."; "A sentence under this guideline also accounts for conduct that would subject the defendant to an enhancement under §2D1.1(b)(2)"). Had

of GSR, which are themselves significant for this Defendant whose crimes would readily support an upward variant sentence.

Given the discretion and concessions already reflected in the Plea Agreement, there is no reason to go below the government's recommendation. Had the government not agreed to limit his upward exposure, the Defendant would potentially have faced the prospect of a much greater GSR than he currently does. In this context, a sentence of 270 months provides just punishment for the Defendant.

### 2.   The Lack of a Criminal Record in Context

In context, the Defendant's lack of prior criminal convictions is not a basis to go below 270-months. For years, while under investigation and Indictment, the Defendant only expanded his DTO and upped the ante of his crimes. In a general sense, the state court system's inability to bring the Defendant to trial for serious gun and firearm charges for over 18 months during the pandemic, is not a basis for further leniency when the Defendant has been shown to have continued committing the crimes. In fact, he boasted of his crimes on social media, committed a robbery immediately after a court appearance, and expanded his drug operation. This conduct bespeaks an attitude that should be met with punishment and not further lenience. In fact, the Defendant's brazen escalation of his crimes while on pretrial release is itself a basis to impose a sentence along the lines of the government's recommendation.

This Court must also consider the fact that the Defendant engaged in the same drug and violent crimes as part of the same DTO, while under Indictment.[29] This failure to stop dealing drugs while on

---

the offense level increased by 4 points, the GSR even under the Parties' calculation would be 324 to 405 months.

[29] The two open state court cases are being adopted in this prosecution (PSR ¶ 283-284). The Essex County District Attorney's Office has agreed to dismiss those cases after acceptance of the Plea Agreement in this case. See ECF #72, p. 2 ("Upon acceptance of this Plea Agreement by the Court, the parties understand that the Essex District Attorney has agreed to dismiss Essex Superior Court, Docket No. 2077CR00071, and Salem District Court, Docket No. 2136CR000401.").

pretrial release suggests that any lenience will be exploited.  See PSR ¶¶279, 283-285.  And, more significantly, he did so while orchestrating a staggering amount of unnecessary violence.  That is, until now and the staggering reality of the drugs and violence he is responsible for is marshaled together. As the Defendant's tattoos make clear; he considers himself a "Menace II Society" and indicates that he will "Live by the Gun Die by the Gun." PSR ¶ 303; Exhibit 15, p. 17.  The nature and extent of his crimes certainly suggest both tattoos are accurate assessments.  Accordingly, this Court should confidently impose the 270-month sentence, because it properly accounts for the history and characteristics of the Defendant, and his wanton destruction of his community through drugs, firearms, and violence.

### C.    Reflect the Seriousness of the Offense, Promote Respect for the Law, and to Provide Just Punishment for the Offense

A sentence of 270 months is also necessary in order for the sentence to reflect the seriousness of the offense.  The DTO was sophisticated and longstanding, and the drug weight at issue here is at the top of the chart.  The violence is also extraordinary in terms of one Defendant being responsible for three substantive acts of violence during the course of the DTO's operation.

On its own, the video of the machinegun riddling a neighborhood with gunfire is chilling.  The Defendant, while not himself the shooter, is legally responsible for this incident: his phone activity is consistent with foreknowledge that it was about to take place, he communicated about it minutes after it transpired, talked with an individual who is inferably the shooter, and burned the shooter's clothing after the fact (and was filmed doing so).  This incident alone compels the imposition of a sentence substantially above the 15-year mandatory minimum.

By comparison, the machinegun shooting renders the other serious robbery incidents almost banal.  Robbing individuals at gunpoint in their home and running up on them with an AR-15 as they walked toward a vehicle were simply part and parcel of this Defendant's daily business.[30] All of this

---

[30] That is to say nothing of the three shootings he boasted about committing in audio messages he sent via social

violence distinguishes this case and this Defendant from other drug offenders and suggests that the seriousness of the offense and just punishment can only be served by a sentence of 270 months.

Instilling respect for the law must also factor into this Court's sentence. This Defendant mocked the state criminal justice system both by brazen crimes he orchestrated while on release, and through the fact that he posted images and videos implying his continuing crimes while on pretrial release.  See Exhibit 16, p. 36 (Snapchat image of mugshot).  A 270-month sentence would also illustrate that drug crimes and violent crimes are taken seriously by the Court, the public, law enforcement and community members whose sense of security was needlessly destroyed by the violence and drugs that this Defendant brought to the streets.

Consideration of what amounts to a just punishment for these crime should also factor into this Court's sentence.  Serious violent crimes and astonishing drug quantities implicated in this case require a commensurate punishment. A sentence of 270 months would reflect the seriousness of the offense, provide just punishment, and instill respect for the law – all told, 270 months is a long sentence, but one that is proportional to the Defendant's crimes.

### D.    Deterrence and Proportionality

General deterrence must also be considered, and this Court should be mindful of the message that this sentence will send to drug traffickers of this magnitude, and violent offenders who brazenly target others.  A 270-month sentence imposed in the context of this case -- promptly, without litigation, through a change of plea shortly after arraignment -- sends a resounding message large-scale to drug distributors, associated gang members, and violent offenders in the orbit of drug dealers.  That message is simple: detention, swift punishment and imprisonment for well-over two decades in a federal prison await them if they choose to deal drugs at this scale, and commit wanton violence with firearms.  In the government's estimation, that is a message that should be sent by this Court, and one that will

---

media that cannot be substantively linked to a particular incident.  See PSR ¶ 190-191.

reverberate through the community due to the prominence of this Defendant among drug offenders in this District.

Specific deterrence to this Defendant and other members of the DTO would also be well served by a 270-month sentence.  In contrast to the Defendant's prior experience in state court that did nothing in the realm of deterrence, a 22-year sentence in this case will specifically deter this Defendant from crimes in the future.  After release, further punishment will await him if he reoffends or returns to drug dealing.

### E.       Public Protection

As a final and paramount factor, the Court must protect the public from drug traffickers and violent offenders such as this Defendant for as long as the statutory considerations will permit. Given the timeline of violence and drug dealing, this Court can be assured that only incarceration will protect the public from the Defendant and his crimes.  Given the drug weight at issue, shootings and robberies, this Court should ensure that for 270 months the Defendant cannot destroy more lives through fentanyl and senseless violence.

### CONCLUSION

For the foregoing reasons, the government recommends that the Court sentence the Defendant to a term of imprisonment for 270 months, followed by five years of supervised release.

Respectfully submitted,

JOSHUA S. LEVY
First Assistant United States Attorney

By:       */s/ Philip A. Mallard*
PHILIP A. MALLARD
Assistant U.S. Attorney
United States Attorney's Office
1 Courthouse Way, Suite 9200
Boston MA 02210
617-748-3674

<u>CERTIFICATE OF SERVICE</u>

I hereby certify that this document filed through the ECF system will be sent electronically to the registered participants as identified on the Notice of Electronic Filing (NEF).

*/s/ Philip A. Mallard*
PHILIP A. MALLARD
Assistant U.S. Attorney

Date:   June 23, 2022

List of Exhibits
1.      Compact Disc with Recordings
2.      Mass. DPH Statistics for Massachusetts
3.      May 2018, Danvers Photos
4.      June 2020, Salem Photos
5.      January 2020, Photographs from 2002 Founders Way (Defendant's Bedroom)
6.      January 2020, Photographs from 2002 Founders Way (Basement)
7.      June 2021, Room 309 Photographs
8.      June 2021, Room 209 Photographs
9.      June 2021, 857 Broadway Photographs
10.     June 2021, 12 Fremont Place Photographs
11.     June 2021, Reliance Row Photographs
12.     June 29, 2021, Arlington Street Shooting Crime Scene Photographs
13.     Massachusetts State Police Crime Lab, Ballistics Comparison
14.     Lynn District Court, Docket No. 20-162
15.     MNM Records Instagram Posts
16.     Still Images from Videos